

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

LODGED
CLERK, U.S. DISTRICT COURT

MAR 21 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

CLERK, U.S. DISTRICT COURT

MAR 25 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

ENTERED ON ICMS

MAR 25 2003

CV

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TICKETMASTER CORPORATION, an Illinois corporation; and TICKETMASTER ONLINE – CITYSEARCH, INC., a Delaware corporation,<br><br>   Plaintiffs,<br><br>   v.<br><br>TICKETS.COM, INC., a Delaware corporation,<br><br>   Defendant.<br><br>TICKETS.COM, INC., a Delaware corporation,<br><br>   Counterclaimant,<br><br>   v.<br><br>TICKETMASTER CORPORATION, an Illinois corporation; and TICKETMASTER ONLINE – CITYSEARCH, INC., a Delaware corporation,<br><br>   Counterclaim Defendants. | CASE NO. 99-07654 HLH (VBKx)<br><br>[PROPOSED] JUDGMENT IN FAVOR OF COUNTERCLAIM DEFENDANTS TICKETMASTER CORPORATION AND TICKETMASTER ONLINE CITYSEARCH, INC. ON TICKETS.COM'S ANTITRUST COUNTERCLAIMS<br><br>Honorable Harry L. Hupp<br><br>THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d). |

By Order dated March 6, 2003 (attached hereto as Exhibit A) the Court has granted counterclaim defendants Ticketmaster Corporation and Ticketmaster Online–Citysearch, Inc.'s ("Ticketmaster") Motion for Summary Judgment Re: Tickets.com's Antitrust Counterclaims, and having dismissed with prejudice the First, Second, Third,

Gibson, Dunn & Crutcher LLP

Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth claims for relief based on alleged violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 & 2) and Section 16700 et seq. of the California Business and Professions Code (the "Cartwright Act") (collectively the "antitrust claims") alleged in the Second Amended Counterclaim filed by counterclaimant Tickets.com, Inc. ("Tickets.com");

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.      All antitrust claims asserted by counterclaimant Tickets.com against Ticketmaster shall be and hereby are dismissed with prejudice.

2.      Judgment shall be, and hereby is, entered in favor of Ticketmaster on counterclaimant Tickets.com's antitrust claims, and counterclaimant Tickets.com shall take nothing from Ticketmaster on the antitrust counterclaims.

3.      Ticketmaster shall have and recover its costs of suit in the amount of $_____.

This is a final judgment for purposes of Rule 54(a) of the Federal Rules of Civil Procedure.  It shall be entered pursuant to Rules 58 and 79(a) of the Federal Rules of Civil Procedure.

DATED:  March 24, 2003

_____
The Honorable Harry L. Hupp
Senior United States District Court Judge

Respectfully submitted
ROBERT E. COOPER
STEVEN E. SLETTEN
GIBSON, DUNN & CRUTCHER LLP

By: _____
       Steven E. Sletten
Attorneys for Counterclaim Defendants
Ticketmaster Corp. and Ticketmaster Online
Citysearch, Inc.

10685841_1.DOC

Gibson, Dunn &
Crutcher LLP

2

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES — GENERAL

Case No. **CV99-7654-HLH (VBKx)**                                    Date **March 6, 2003**

Title **Ticketmaster Corp. v. Tickets.Com, Inc.**

---

**DOCKET ENTRY**

Priority ☐
Send ☐
Enter ☐
Closed ☐
JS-5/JS-6 ☐ **NO**
JS-2/JS-3 ☐
Scan Only ☐

FILED
CLERK, U.S. DISTRICT COURT
MAR - 7 2003
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

**PRESENT**

HON. **HARRY L. HUPP** , **SENIOR JUDGE**

| Carolyn Trump | ~~Cynthia L. Mizoll~~ |
|---|---|
| Deputy Clerk | Court Recorder |

**ATTORNEYS PRESENT FOR PLAINTIFFS:**

Steven E. Sletten, Esq.
Robert E. Cooper, Esq.
Robert H. Platt, Esq.
Mark S. Lee, Esq.
Mack Kenney

**ATTORNEYS PRESENT FOR DEFENDANTS:**

William Taylor, Esq.
Howard Holderness, Esq.

(The above attorneys appeared before the court on Monday, March 3, 2003.)

**PROCEEDINGS:**   TICKETMASTER'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: ANTITRUST CLAIMS

---

ORDER    (also, if applicable, findings and memorandum opinion):

SEE PAGE 2

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d).



ENTERED
CLERK, U.S. DISTRICT COURT
MAR - 7 2003
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

3

CV99-7654-HLH
3/6/03
Page Two

The motion of counter-defendants Ticketmaster
Corporation and Ticketmaster Online-CitySearch, Inc.
(hereafter collectively TM) for summary judgment as to the
anti-trust claims (Sherman Act and Cartwright Act) of the
counterclaim (hereafter CC) of Tickets.com, Inc. (hereafter
TX) is granted and said claims are dismissed. This minute
order is the order dismissing said claims; no judgment is
entered at this time by reason of the existence of other
claims against each other by both TM and TX.

While there are certain differences in the operative
facts between the parties, the general background of the
ticket business and the competition between TM and TX is
largely undisputed. The conclusions to be drawn from the
undisputed facts are highly disputed. Each party has
presented the economic views of two highly qualified
experts, Professor Daniel L. Rubinfeld for TX and Professor
Benjamin Klein for TM. In stating the background and nature
of the competition between the two contestants, the court
has drawn heavily on the descriptions of the two experts
where they do not conflict.

The battleground of this motion must be considered on
the basis of the relevant market as described by Professor
Rubinfeld for the simple reason that, on summary judgment, a
dispute of fact must be assumed to be resolved on the basis
of the view of the party resisting summary judgment. Thus,
while Professor Klein has many cogent objections to the
relevant market as opined by Professor Rubinfeld, since
there is respectable reasoning behind Professor Rubinfeld's
opinion as to the relevant market, it is accepted for
purposes of this motion for summary judgment. The basic
structure of the market must be described (as both parties
describe it) to understand the significance of the
description of the relevant market as contended by TX.

Both TM and TX are ticketing service companies for
those in the entertainment business. They provide the
service of marketing the product (tickets) of arenas
(stadiums, auditoriums, theaters, sports arenas) which put
on concerts, sports events, shows, and other events attended
in person by customers, i.e., the public. The business of

4

CV99-7654-HLH
3/6/03
Page Three

distributing tickets has become increasingly complex as the
size of audiences has increased, and the size of arenas has
increased to accommodate them. Thus, the task of selling
tickets to the public has become more complex, proceeding
from the straight-forward box office at the arena itself to
the present day complex of four methods of selling tickets
to large venues: the box office at the arena, remote box
offices established in the community (primarily in chain
retail outlets), sales by telephone from telephone centers,
and most recently, and the fastest growing method of sales,
over the internet. TM and TX compete, using all four of the
sales methods depending on the needs of the venue. To sell
tickets in all four modes at the same time demands the use
of multiple networked computers operating at each of the
points of sale, which have the software and capability to
determine what tickets are available to be sold at any point
in time, and to manage the inventory of tickets for each
event so as to meet the ticket purchaser's desire for price
and location. Obviously, this requires complex networking of
computers placed at each point of sale with complicated
software systems.  Because of the complexity of selling
tickets by the four methods, a high percentage of tickets
for large arenas are sold by companies providing the
necessarily specialized ticketing service.

The two major competitors nationwide in the business
are TM and TX. However, there are local companies providing
the services in particular areas, and there is a growing
portion of the market where the arena itself does its own
ticketing business using software sold or leased to it by
Paciolan (a competitor whose business method is to license
software to a venue) or TX (which has a software licensing
division). However, Professor Rubinfeld defines the relevant
market in a way which excludes the software licensing
competitors and the small regional ticket sellers, as well
as smaller arenas. He defines the relevant market as the
market for full service ticket distribution services
purchased by major venues. By full service ticketing,
Professor Rubinfeld means the selling of tickets
by all four methods (venue box office, retail outlets,
telephone sales, and internet sales) for arenas with a
capacity of over 5,000 reserved seats which sell over

5

CV99-7654-HLH
3/6/03
Page Four

100,000 single tickets annually for live events. He
identifies 41 regional areas which have such arenas and
which have about 150 qualifying arenas among them.
Professor Klein has manifold objections to the description
of the relevant market principally because there are many
smaller arenas which have, in total, significant economic
impact, and because the full service description leaves out
a small but potentially growing market segment--that of
licensed software to the arenas themselves which provides an
alternative for arenas which do not care for either TM or
TX.  However, for the reasons stated above, Professor
Rubinfeld's description of the relevant market is accepted
for purposes of this motion.

      In the relevant market as described, TM has by far the
dominant share of the business. In 31 of the 41 regional
areas, of the larger arenas, TM has exclusive contracts
which cover 75% of the tickets sold. In 25 of the regional
areas, TM's market share was about 90%. In addition to
contracts with the arenas (or venues) themselves, TM has
long term exclusive contracts with large scale promoters of
events (SFX--now a division of Clear Channel--, SMG, and
House of Blues) which produce shows as well as own or manage
arenas, and which can sometimes select ticket vendors.

      TM typically does business by signing a long term
exclusive contract with a venue (or arena) which calls for
TM to use all four methods of distribution. If the venue
retains its own box office, TM provides the hardware and
software and trains the box office staff. The contracts are
exclusive, meaning that the venue may not sell tickets
through any other company (with exceptions in the case of
season tickets to sporting events). The contracts are long
term, usually between three and ten years, and average six
years. The contracts are negotiated at arms length between
the venue and TM, and do not follow a standard form--there
are no contracts of adhesion. Venues frequently demand and
get substantial sums in advance and TM typically negotiates
for repayment of these sums by taking a larger percentage of
the take for a sufficient period to recoup the advance.
(Among other things, venues frequently need large cash down-
payments to build or modernize a stadium or arena.)  The

6

CV99-7654-HLH
3/6/03
Page Five

long term exclusive contracts come up for bid (the normal
method of awarding contracts) at about 20% per year (or
more). Of the 140 or so contracts starting since 1998, TX
and TM contested for every one.

TX does business in the same way. The typical
negotiation is by contested bids (formal or informal,
sometimes followed by individual negotiations). TX also
typically signs venues to long term exclusive contracts,
and, as does TM, makes cash advances with similar frequency.
Unlike TM, TX will bid for portions of the ticket selling
business. In one notable confrontation, Major League
Baseball (MLB) requested bids for a national internet
contract, with each team to retain other methods of sale
(telephone, box office, retail outlets, etc.). Both TM and
TX contested for the MLB internet contract, which was
awarded to TX. TM, which had historically refused to
interact with other ticket selling companies, then refused
to negotiate with individual baseball teams for the balance
of the ticket selling business. TX capitalized on this by
obtaining a number of baseball full service contracts
(including for the Giants' new Pac Bell stadium for ten
years). When SFX, the nation's largest promoter of events
and the owner or manager of many arenas, decided to contract
out its ticket selling business, TM and TX were both in
vigorous competition. SFX signed with TM, but TX had
proposed an even longer term contract with a higher down
payment than TM. There are numerous other instances where TX
and TM have competed for the same long term exclusive
contracts with numerous venues or multiples of venues.

As to the history of the industry, TM started in 1980
when by far the largest market share was held by Ticketron,
one of the first of the nationwide computerized ticket
companies. TM developed from a small start-up to be the
dominant competitor in about 10 years, mainly through its
highly developed computer system which could offer the
customer the best available ticket in the house at any of
its sales terminals (box office, retail, telephone, and,
eventually, internet). In 1991, it acquired Ticketron and
since has become the dominant company in the industry. It
claims to have reached its lofty status in the industry by

7

CV99-7654-HLH
3/6/03
Page Six

offering venues a better service and product than its
rivals, and denies using predatory tactics. TX started in
the mid-90's with a different game plan, focusing primarily
on the internet.  As time went on, the internet developed
into a major part of the business (about one third and
expanding), but box office, retail, and telephone business
have remained critical to a successful operation. TX has
adapted and now competes for full service business using all
the methods of sale for the contracts of major venues. Its
method of doing internet business clashed with TM's
concepts, leading to this lawsuit starting in 1999.  For the
history of this aspect of the case, see the court's order on
the intellectual property parts of this action of this date
and the prior orders on the motion to dismiss and the motion
for preliminary injunction. The major dispute in this
lawsuit is now TX's anti-trust CC now involved in this
motion.

    While there were numerous anti-trust theories
originally advanced, they have been reduced to the one
specified by Professor Rubinfeld. Professor Rubinfeld's
theory is that the use by TM of long term exclusive
contracts have no reasonable economic justification and
provide barriers to entry into the ticket business by their
long term and exclusive nature. In his theory, the barriers
to entry are exacerbated by the business power of TM's name,
by the difficulty of establishing retail outlets before
bidding, by the web of long terms contracts with multiple
venue producers and venue managers and the desirable retail
establishments, as well as the long term exclusive contracts
with the individual venues. Professor Rubinfeld opines that
the combination makes entry by a newcomer (i.e., TX)
virtually impossible and gives TM the power to raise its
rates above competitive levels and well as exclude others.
In the court's opinion, the evidence does not justify these
conclusions.

    Section 2 of the Sherman Act prohibits monopolies,
attempts to form monopolies, as well as combinations and
conspiracies to do so.  15 U.S.C. § 2.  The offense of
monopoly under § 2 of the Sherman Act has two elements: (1)
the possession of monopoly power in a properly defined

CV99-7654-HLH
3/6/03
Page Seven

relevant market; and (2) the willful acquisition or
maintenance of that power by means of anticompetitive,
predatory conduct, as distinguished from growth or
development as a consequence of a superior product, business
acumen, or historical accident. <u>Grinnell Corp.</u> '66 384 US
563, 570-571, 16 LEd2d 778. To prove attempted
monopolization under Section 2, TX must establish: (1) a
properly defined relevant market; (2) TM's specific intent
to monopolize that market; (3) anticompetitive, predatory
conduct by TM; and (4) that TM has a dangerous probability
of achieving monopoly power. <u>Spectrum Sports</u> '93 506 U.S.
447, 456, 122 LEd2d 247.

    The power and reputation of the TM name and business
reputation does give it a substantial advantage over its
rivals. Its history of displacing Ticketron as the giant in
the industry by better service, methods, and results
continues to give it an advantage, particularly in retaining
its incumbency among satisfied customers. However, at least
in this circuit, brand name recognition or reputation alone
is not considered a barrier to entry that counts against an
anti-trust defendant. (<u>Harcourt-Brace Jovanovich</u> 9Cir'97 108
F3d 1147, 1154; <u>Omega Environmental, Inc.</u> 9Cir'97 127 F3d
1157, 1164.)

    Size alone or heavy market share alone does not make
one a monopolist (or in danger of becoming one). To qualify
as a monopolist or have a dangerous likelihood of becoming
one, one must have either the power to control prices or to
exclude competition. In fact, the power to exclude
competition is almost a necessity to be able to charge
prices above competitive levels. (<u>Grinnell Corp.</u> '66 384 US
563, 16 LEd2d 778; <u>Image Technical Services</u> 9Cir'97 125 F3d
1195.)  There must be evidence of the ability to control
prices or exclude competitors. (<u>Oahu Gas Servs. Inc.</u> 9Cir'88
838 F2d 360.) The evidence here establishes that these
conditions do not exist because of the bidding nature of the
competition, in which TX is fully able to join, that the
venues have the bargaining power to prevent being taken
advantage of, that prices cannot be unilaterally raised
because of the long term contracts controlling the prices,
and that there are no meaningful barriers to entry by TX if

9

CV99-7654-HLH
3/6/03
Page Eight

it can convince venues that it can provide better service or
a better price.

The evidence is uncontradicted that virtually all long
term contracts are awarded after some form of bidding
competition. The bidding may be more or less formal, but
every time a contract is up for renewal (about 20% or more
of the total per year), TX as well as TM have the
opportunity to compete for the contract. TX has competed in
all situations. The fact that TM has won the majority of
these competitions shows only that the contracting venue
believes that TM offers the better deal, not only in terms
of price, but also in terms of reliability and ability to do
a competent job. However, TM's victories are not unanimous.
TX has prevailed in head to head competition in a number of
regions, and most impressively in major league baseball. The
bidding nature of the competition is a powerful deterrent
against the existence of monopoly power so long as there are
competitors to bid so as to give the customer an
alternative, and TX has been a major alternative. There is a
third option which may become more important in future
years--that is the option that large venues have to
establish their own ticket distribution service by leasing
the software from TX or Paciolan and setting up their own
local retail outlets, telephone and internet system. This
has been done at a number of university venues (which have
some special needs) and by at least one major league
baseball team. This is a viable alternative which keeps the
market power of TM from removing alternatives from the
venues. That the use of a bidding system is an indication of
lack of power to exclude competitors from the market can be
deduced from Kirk-Mayer CDCA'86 626 FSupp 1168 and Nat'l
Reporting Co. 8Cir'85 763 F2d 1020.

The evidence on ability to set prices is equivocal. TM
points out that the long term contracts prevent TM from
raising prices to its customers--the venue--during the
contract. TX says that prices to consumers, i.e., the
public, tend to increase with long term contracts. The
parties are talking about two different things. However, the
TX version is not particularly relevant here, since prices
to the consumer are not affected by competition between the

10

CV99-7654-HLH
3/6/03
Page Nine

ticket service providers for the venues' business, which is the subject of this suit.

Among the barriers to entry suggested by Professor Rubinfeld is the lack of a local presence--meaning retail outlets--possessed by the firm bidding for contracts in a region. By his definition of the relevant market, ability to sell through local retail markets is assumed to be a necessary part of the analysis. But the evidence does not support the theory that such is a barrier to entry. The evidence shows that a ticketing company can establish local outlets after the contract is obtained, and that this is feasible for a new entry into the region. The cost to establish each local outlet is reasonable--about $5,000 apiece for the hardware and software. Retail facilities in general welcome such outlets in their stores because they increase traffic through the stores, and can be a source of revenue for them. In each case where TX was the winning bidder for a major venue, it was able in a short time to establish its network of retail box offices. In the instance pointed to by Professor Rubinfeld--Cincinnati--where he says that TM had tied up the "best" local retail outlets (including Krogers), TX was able to establish a chain of retail outlets in short order after obtaining the Reds' baseball contract. This has been true in each venue signed up by TX. Even through TM had already contracted with the most desirable retail venues (which appear to be record stores and chain grocery stores), TX has found alternatives sufficient to solve the problem. While having sufficient inventory of tickets is necessary, a single local major venue can provide the minimum needed to allow a ticketing service to operate profitably. And having obtained one major venue, others follow with more ease. Thus, the evidence does not support the theory that lack of pre-established retail outlets is a significant barrier to entry.

TX's major point is that long term exclusive contracts with large venues narrows the immediate field for competition for such contracts for TX. Undoubtedly, this is true. The question here, though, is whether such contracts are commercially reasonable.  See Twin City Sportservice 9Cir'82 676F2d 1292, 1304, *cert denied*, Twin City

11

CV99-7654-HLH
3/6/03
Page Ten

Sportservice '82 459 US 1009, 74 LEd2d 400. The evidence
points very strongly to the conclusion that the venues
themselves prefer long term exclusive contracts for their
own reasons, that they have the economic power to resist
long term contracts if it were in their interests to do so,
and overwhelmingly, they prefer the long term contracts and
prefer them to include the retail outlets, the telephone
centers, and the internet connections. This can be for a
number of reasons. Where the venues run their own box office
at the venue site, the computers need to be compatible with
the computers at the other sites, which means that changing
ticket servicers every few years means retraining staff on
new computers and software. Changing servicers often also
means changing retail outlets (with which their customers
become accustomed to) and also changing telephone and
(perhaps) internet addresses. If the ticket servicer has
reasonable performance and price, continuity leads to
customer usage and satisfaction. Costs can be fixed for a
longer, more predictable future. But by far the most
important reason why venues prefer long terms contracts is
that this is the method by which they can obtain cash up-
front from the ticket servicer, but at the cost of a long
term contract, so that the ticket servicer may amortize the
cost with the expected income over the years of the
contract. Often, the large up-front payment is obtained to
build the venue or to remodel it, to the mutual benefit of
the ticketing service and the venue, but a long term
contract is then needed to support the cash payment demanded
by the venue. Some venues prefer exclusive contracts because
it simplifies their bookkeeping and reduces the cost of
renegotiating the contracts every few years. Virtually no
venues have complained about long term contracts or felt
forced into them against their desires. Both TX and TM use
the long term exclusive contract to accommodate their
customers' desires, to their mutual benefit. So does
Paciolan and TX with licensing software. Thus, the evidence
shows that the long term exclusive contract is not for the
purpose of excluding competition, but for the mutual
economic benefit of both competitors. It is a mutually
desired reasonable business practice from which no anti-
trust inferences may be drawn. The effect of such contracts
on entry to the market is also overstated by TX. About 20%

12

CV99-7654-HLH
3/6/03
Page Eleven

or more of the contracts come up for renewal each year. TX's figures show that there are about 150 major venues in the country, meaning an average of about 30 come up for renegotiation each year, or 2 plus each month on the average. These renewals ought to be sufficient to give TX a chance to show that it can provide a better product, service, or price than can TM. The evidence does not support the argument that long term exclusive contracts are an unreasonable drag on real competition in the industry. Just as TM overhauled Ticketron in ten years, TX, if it has the better product, can overhaul TM.  The evidence does not support the theory that long term exclusive contracts are an unreasonable business technique which leads to exclusion of TX from the market.

     TX did not point to any facts in opposition to TM's motion for summary judgment which would create a material issue of fact.  Although the defendant generally has the burden of coming forward with a legitimate business justification after the plaintiff has shown evidence of monopolistic intent, the plaintiff, in this case TX, ultimately has the burden of proving that the defendant acted without a legitimate business justification. City of Vernon 9Cir'92 955 F2d 1361, 1366, cert denied, City of Vernon '92 506 US 908, 121 LEd2d 228; Calculators Hawaii 9Cir'83 724 F2d 1332, 1339. Cf. Aspen Skiing '85 472 US 585, 608-611, 86 LEd2d 467 (implying that defendant has burden of production and proof). In order to survive summary judgment, TX had to point to evidence demonstrating that there was a genuine issue of material fact as to whether TM in fact acted on the asserted grounds. Having failed to do so, summary judgment is appropriate.

     TX points out that TM has enhanced its advantages with long term contracts by signing long terms exclusive agreements with producers such as SFX, SMG, and House of Blues (HOB). Many of these producers either own or manage venues and the long term contracts with them proliferate TM's advantage. This argument may have some merit if the basic theory has merit. However, the facts show that TX had opportunity to bid for the contracts for these multi-venue companies, and that it did so. There is no evidence that TX

13

CV99-7654-HLH
3/6/03
Page Twelve

was excluded from contesting for the business or that any
anti-competitive conduct prevented it from prevailing. The
conclusion must be that the customer thought that TM had the
better business deal. There is one aspect of the SFX and SMG
contracts which is suspicious. Each contract calls for SFX
or SMG to use its best efforts to obtain venues to sign
contracts with TM. However, TX has not contended that these
are more than incidental to its long term exclusive contract
theory or that TX has lost business because of the best-
efforts provisions in the SFX and SMG contracts.

TX contends that the refusal of TM to "unbundle" its
business offerings (i.e., to do business with certain of the
sales techniques but not all) is anti-competitive. TM's long
standing policy is to do all of the ticket marketing that is
done by retail outlets, telephone sales, and internet sales,
and to supply the networking computer systems through which
all tickets are sold.  When TX won the internet contract for
all of baseball, TM backed out of providing all forms of
sale because of its policy of "bundling" all of its services
or do none of them. In fact, this gave TX an opportunity to
sign up many baseball teams for the non-internet business,
which it did. TX established the local retail outlets
necessary to handle the business as well as set up the
telephone ordering systems. TX contends that the refusal of
TM to "unbundle" its offering was an anti-competitive move
meant to show baseball "who is boss". The contention seems
outlandish. It is not supported by any evidence. It allowed
TX in a door which it had found difficult to open before. TM
explains its reason of not wanting to have to give up its
trade secrets by having to merge its computer systems with a
competitor and by losing control of ticketing inventory,
which it believes is essential for it to do business. This
would seem to be a legitimate business justification for the
alleged refusal by TM to aid TX. <u>Oahu Gas Serv.</u> 9Cir'88 833
F.2d 360, 368. In any event, no anti-competitive result is
seen from this event and it does not support TX's position
in the anti-trust case.

TX also claims that the long term exclusive contracts
are violations of § 1 of the Sherman Act (combination in
restraint of trade) as well as § 2 (monopolization), but

14

CV99-7654-HLH
3/6/03
Page Thirteen

similar considerations apply as with monopolization (the "rule of reason" applies in evaluating the effect of contracts on competition). See, e.g. Jefferson Parish Hosp. '84 466 US 2, 30, n. 51, 80 LEd2d 2; Morgan 9Cir'91 924 F2d 1484, 1488; Barry Wright 1Cir'83 724F2d 227, 239. Thus, valid business reasons can justify challenged conduct. See Twin City Sportservice 9Cir'82 676F2d 1292, 1308, *cert denied*, Twin City Sportservice '82 459 US 1009, 74 LEd2d 400. The result is the same as under the monopoly analysis.

The parties agree that the Cartwright Act claims are coextensive with the Sherman Act claims. The summary judgment motion is granted to remove the anti-trust issues from the CC in this case.

The parties have agreed that the CC for violation of B&P Code § 17200 will be handled later and is not included in this motion.

A:997654.33

15

# CERTIFICATE OF SERVICE

## MAIL, COMMERCIAL OVERNIGHT MESSENGER, FAX, HAND
## DELIVERY

I, Joyce Tanabe, hereby certify as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 333 South Grand Avenue, Los Angeles, California 90071, in said County and State; I am employed in the office of Steven E. Sletten, a member of the bar of this Court, and at his direction, on March 21, 2003, I served the following:

**NOTICE OF ERRATA TO [PROPOSED] JUDGMENT IN FAVOR OF COUNTERCLAIM DEFENDANTS TICKETMASTER CORPORATION AND TICKETMASTER ONLINE CITYSEARCH, INC. ON TICKETS.COM'S ANTITRUST COUNTERCLAIMS**

on the interested parties in this action, by:

☐    **Service by Mail:**  placing true and correct copy(ies) thereof in an envelope addressed to the attorney(s) of record, addressed as follows:

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

☒    **Service by Commercial Overnight Messenger:**  placing true and correct copy(ies) thereof in an envelope addressed to the attorney(s) of record, addressed as follows:

Alfred C. Pfeiffer, Jr., Esq.
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111-4067

Howard H. Holderness, III, Esq.
Morgan, Lewis & Bockius LLP
One Market Street
Spear Street Tower
San Francisco, CA  94105

Gibson, Dunn &
Crutcher LLP

Mark S. Lee, Esq.
Manatt Phelps & Phillips
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614

and after sealing said envelope I caused same to be delivered to the aforementioned

attorney(s) by qualified commercial overnight messenger.

☒    **Service by Fax:** causing a true copy thereof to be sent via facsimile to the

attorney(s) of record at the telecopier number(s) so indicated, addressed as follows:

| Attorney Name & Address | Fax and Callback Number |
|---|---|
| Alfred C. Pfeiffer, Jr., Esq.<br>Bingham McCutchen LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111-4067 | FAX: (415) 393-2286<br>Tel.: (415) 393-2000 |
| Howard H. Holderness, III, Esq.<br>Morgan, Lewis & Bockius LLP<br>One Market Street<br>Spear Street Tower<br>San Francisco, CA 94105 | FAX: (415) 442-1010<br>Tel.: (415) 442-0900 |
| Mark S. Lee, Esq.<br>Manatt Phelps & Phillips<br>11355 West Olympic Boulevard<br>Los Angeles, CA 90064-1614 | FAX: (310) 312-4224<br>Tel.: (310) 312-4000 |

and that the transmission was reported as completed and without error. A true and

correct copy of said transmission report is attached hereto.

☐    **Service by Hand Delivery:** delivering true and correct copy(ies) thereof and

sufficient envelope(s) addressed to the attorney(s) of record, addressed as follows:

to a messenger or messengers for personal delivery.

I certify under penalty of perjury that the foregoing is true and correct, that the

foregoing document(s), and all copies made from same, were printed on recycled

paper, and that this Certificate of Service was executed by me on March 21, 2003 at

Los Angeles, California.

Joyce Tanabe

Gibson, Dunn &
Crutcher LLP

```
           * * *  TRANSMISSION RESULT REPORT ( MAR.21.2003  1:43PM ) * * *

                                                            TTI   GD&C LA.#8

  DATE    TIME   ADDRESS          MODE      TIME   PAGE  RESULT  PERS. NAME          FILE
------------------------------------------------------------------------------------------
 MAR.21.  1:39PM  913103124224    TES      3'56"  P.19   OK                          396


     # : BATCH           C : CONFIDENTIAL    $ : TRANSFER       P : POLLING
     M : MEMORY          L : SEND LATER      @ : FORWARDING     E : ECM
     S : STANDARD        D : DETAIL          F : FINE           > : REDUCTION
     * : PC              % : PC DIRECT
```

.\* \* .\*  TRANSMISSION RESULT REPORT ( MAR.21.2003  1:47PM ) \*'\* \*

TTI  GD&C LA. #10

| DATE | TIME | ADDRESS | MODE | TIME | PAGE | RESULT | PERS. NAME | FILE |
|------|------|---------|------|------|------|--------|-----------|------|
| MAR.21. | 1:43PM | 15925520000591415393 | TES | 4'25" | P.19 | OK | | 391 |

```
# : BATCH          C : CONFIDENTIAL    $ : TRANSFER       P : POLLING
M : MEMORY         L : SEND LATER      @ : FORWARDING     E : ECM
S : STANDARD       D : DETAIL          F : FINE           > : REDUCTION
* : PC             % : PC DIRECT
```

THE FOLLOWING FILE(S) ERASED

| FILE | FILE TYPE | OPTION | TEL NO. | PAGE | RESULT |
|------|-----------|--------|---------|------|--------|
| 083 | TRANSMISSION | | 15925520000591415442101<br>0 | 19 | OK |

ERRORS

1) HANG UP OR LINE FAIL     2) BUSY     3) NO ANSWER     4) NO FACSIMILE CONNECTION